**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Aida Esmeralda Campos, *et al.*, | No. CV-24-00987-PHX-JJT |
| Plaintiffs, | **ORDER** |
| v. | |
| Arizona Board of Regents, *et al.*, | |
| Defendants. | |

At issue are two motions to dismiss Plaintiffs' Second Amended Complaint (Doc. 75, SAC). The SAC names thirty-four separate defendants. These defendants may be grouped into three categories. First, Plaintiffs have sued the Arizona Board of Regents ("ABOR") as the juridical entity responsible for the governance of Arizona State University ("ASU"), as well as thirty individuals who work for or are otherwise associated with ASU. These thirty-one defendants, collectively referred to herein as the "University Defendants," have filed a Motion to Dismiss (Doc. 89, University MTD), to which Plaintiffs filed a Response (Doc. 97, University Response) and the University Defendants filed a Reply (Doc. 101, University Reply). Second, Plaintiffs have sued the former and current Sheriff of Maricopa County, although Plaintiffs subsequently voluntarily dismissed the former Sheriff as a defendant. (*See* Doc. 87.) The current Sheriff, Jerry Sheridan, has filed a Motion to Dismiss (Doc. 88), to which Plaintiffs filed a Response (Doc. 96) and Mr. Sheridan filed a Reply (Doc. 100). Third, Plaintiffs have sued the Arizona Department

of Public Safety, but Plaintiffs have not yet served the Department. Accordingly, neither motion to dismiss is expressly aimed at the claims thereagainst. The Court finds these issues appropriate for resolution without oral argument. *See* LRCiv 7.2(f). For the reasons given below, the Court grants in full Mr. Sheridan's Motion and grants in part and denies in part the University Defendants' Motion. The Court also dismisses the Arizona Department of Public Safety *sua sponte*.

## I.    Background

Since October 7, 2023, Israel has been engaged in an acute military conflict with the Gaza Strip. This conflict has engendered passionate dialogue on a variety of subjects, including the question of whether Israel is committing the crime of genocide. Plaintiffs are a group of individuals who would answer that question in the affirmative. The validity of that belief is of no consequence to the instant matter, and the Court expresses no opinion thereon. Nevertheless, the Court must summarize the claims made in the SAC. In doing so, the Court neither approves nor disapproves of any view advanced by any party.

Following October 7, students around the country engaged in mass demonstrations against the United States' supply of weaponry to Israel. (SAC ¶¶ 43–44.) These demonstrations included "protests, marches, and gatherings." (SAC ¶¶ 43–44.) "In light of this movement and in the weeks leading up to April 26, 2024, from the top of the ABOR chain of command to the bottom of ASU and ASU PD management, plans were made on how to swiftly stifle any such student demonstration should it make it to Arizona's public universities." (SAC ¶ 45.) The University Defendants thus prepared a plan to effectuate their alleged goal of "preventing or squashing any public demonstrations against the use of public assets to fund the genocide in Gaza or affiliation with pro-Zionist entities that might take place at ASU or any other public Arizona university." (SAC ¶ 46.)

Plaintiffs support their assertion of a broad anti-speech conspiracy with the following specific allegations. Defendants Michael Crow and Joanne Vogel were engaged in conversations with Jonathan Greenblatt, the non-party CEO of the pro-Israel Anti-Defamation League, wherein Mr. Greenblatt "explicitly called for ASU to prepare

and coordinate with law enforcement in order to impose clear and immediate consequences on students protesting Zionism and its murderous effects in Gaza." (SAC ¶ 47.) All University Defendants were engaged in various unspecified communications aimed at immediately "nipping" the sort of anti-Israel protests occurring at other universities across the United States, should such protests occur at ASU. (SAC ¶¶ 48–52.) Defendant Michael Thompson was in contact with the non-party Executive Vice President of ASU regarding student protests over Gaza, but the SAC does not describe the nature of this alleged conversation. (SAC ¶ 53.)

Defendants' alleged preparations were put into action on April 26, 2024. On that day, Plaintiffs, who were then all enrolled at ASU, engaged in a "sit-in" protest at a central location on ASU's campus known as the Old Main "in order to peacefully protest the United States' involvement in the genocide being carried out in Gaza and ASU's use of public funds to invest in entities with ties to the perpetrators of that genocide." (SAC ¶¶ 57–60.) The protest lasted until around 11:30pm, at which time ASU police officers ordered the protesters to disperse. (SAC ¶ 61.) Plaintiffs refused to leave and were consequently arrested for trespassing. (SAC ¶ 62.) Both the Maricopa County Sheriff's Office and the Arizona Department of Public Safety facilitated the arrests and provided transportation to detention centers. (SAC ¶¶ 63–64.) The University Defendants were able to receive assistance from the county and state governments because ASU police officials had preemptively "contacted Maricopa County Sheriff's Office ('MCSO') before 10:10am on April 26, 2024, to inform MSCO that it planned to arrest 'between 75-100 individuals from a protest' and asking for assistance in transporting arrestees." (SAC ¶ 54.)

"From the outset, ASU police made their intentions clear; they fully intended to break up any protest, peaceful or otherwise, against Israeli violence in Gaza, regardless of the legality of such actions and with no actual ASU policy in mind to justify such actions." (SAC ¶ 66.) As evidence of the alleged irrelevancy of the protesters' technical trespassing that occurred at 11:30, the SAC asserts that two specific plaintiffs, Mr. Smith and Mr. Clancy, were arrested at 9:00am by ASU police officers Singh, Padilla, Latella,

1    Van Buhler, Mason, and Bathke without any explanation or warning. (*See* SAC ¶¶ 67, 69.)

2    Plaintiffs contend that the purpose of these arrests was "to send a message to other

3    protesters that they too would be arrested if they remained at the protest." (*See* SAC ¶ 67.)

4    The charges against Mr. Smith (but apparently not Mr. Clancy) were later dropped for lack

5    of probable cause. (*See* SAC ¶¶ 67–68.)

6        The day after the protest, Plaintiffs received boilerplate communications from the

7    ASU administration that their enrollment at ASU had been suspended. (SAC ¶ 70.) "In

8    total, approximately 65 suspension notices were completed by ASU Defendants by the

9    afternoon of April 27, 2024, meaning that ASU processed 65 suspensions in less than a

10   single work day, indicating either that the ASU Defendants had preplanned the

11   punishments prior to the protest and ASU's crack down on free speech or that multiple

12   ASU employees worked furiously for hours on a Saturday." (SAC ¶ 71.) Plaintiffs were

13   also barred from entering ASU campus and from communicating with ASU faculty or staff,

14   including professors. (SAC ¶¶ 72–73.) Unsurprisingly, these measures made it impossible

15   for Plaintiffs to complete their studies. (SAC ¶¶ 74–76.)

16       Plaintiffs and their co-protesters were not the only students present at the Old Main

17   on the night in question. There were pro-Israel counter-protesters, as well as neutral

18   fraternity members who were there simply to enjoy the spectacle, including by partying

19   and filming the goings-on. (SAC ¶¶ 77–79.) ASU did not arrest or punish these other

20   individuals, thereby demonstrating that the "curfew" was a pretext and that the real

21   motivation for the arrests was "based solely upon the anti-genocide message being

22   communicated by Plaintiffs' protest." (SAC ¶¶ 77–79.) "Following the events of April 26,

23   2024, and April 27, 2024, Defendant Michael Crow embarked upon a media campaign

24   designed to spread misinformation about the actions of Defendants and Plaintiffs on the

25   night of April 26, 2024, including but not limited to false accusations that Plaintiffs had

26   erected fortifications on ASU property, false assertions that no one had been injured during

27   the arrest, and false descriptions of the role of law enforcement at the protests as simply

28   helping ASU take down encampment tents." (SAC ¶ 83.) "In early summer of 2024,

Defendants issued blanket denials to any appeals or requests for accommodations relating to the unilateral suspensions handed out *en masse* on April 27, 2024, and April 28, 2024." (SAC ¶ 84.) "Those Plaintiffs who did engage in the appeals process were met with predictably hostile arbiters of their claims and universal confirmation of ASU's illegal free-speech crackdown." (SAC ¶ 89.) "Defendants' actions have resulted in substantial and ongoing harm to Plaintiffs' educational and vocational futures, and have caused severe emotional and mental distress, frustration, anxiety, and fear." (SAC ¶ 90.)

Plaintiffs bring two claims. First, Plaintiffs claim that the "Individual Defendants" violated 28 U.S.C. § 1983 by retaliating against Plaintiffs' exercise of speech protected by the First Amendment. (SAC ¶ 91.) Second, Plaintiffs claim that the University Defendants violated Plaintiffs' state-law right to free speech in contravention of A.R.S. § 15-1864, which specifically protects a student's right to protest, subject to reasonable restrictions on the time, place, and manner of such protest. (SAC ¶ 102.) As the Arizona Department of Public Safety is neither an "Individual Defendant" nor a University Defendant, there are no claims against the Department. The absence of any claims thereagainst might explain Plaintiff's decision not to effect service thereon. In any event, the Court hereby dismisses the Arizona Department of Public Safety as a defendant in this matter.

## II.    Legal Standard

Rule 12(b)(6) is designed to "test[] the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A dismissal under Rule 12(b)(6) for failure to state a claim can be based on either: (1) the lack of a cognizable legal theory; or (2) the absence of sufficient factual allegations to support a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). When analyzing a complaint for failure to state a claim, the well-pled factual allegations are taken as true and construed in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*.

"While a complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (cleaned up and citations omitted). Legal conclusions couched as factual allegations are not entitled to the assumption of truth and therefore are insufficient to defeat a motion to dismiss for failure to state a claim. *Iqbal*, 556 U.S. at 679–80. However, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that 'recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

## III.    Discussion

The two motions to dismiss, taken together, assert a battery of arguments against the SAC. The Court will address the sufficiency of the SAC's allegations momentarily, as the purported inadequacy of the pleading constitutes the primary argument for dismissal advanced in both motions. First, however, the Court will address the University Defendants' argument that the Court should judicially notice an anti-camping policy that the University Defendants contend was the real motivation behind the arrests and subsequent disciplinary measures. The outcome of the judicial-notice analysis informs the sufficiency of the pleading.

### A.    Judicial Notice

"Although, as a general rule, a district court may not consider materials beyond the pleadings in ruling on a Rule 12(b)(6) motion, one exception to this general rule is that a 'court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment, as long as the facts noticed are not subject to

reasonable dispute.'" *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1016 n.9 (9th Cir. 2012) (quoting *Intri-Plex Techs., Inc. v. Crest Grp., Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007)). The University Defendants argue that the Court may take judicial notice of ASU's Facilities Management Manual 115: Overnight Use of University Property, which is a policy that purportedly "prohibits camping and overnight occupancy on ASU's campuses with few exceptions not present here." (University MTD at 2.) According to Defendants, this policy is susceptible of judicial notice because it is a public record. (University MTD at 2 n.2.) The Court disagrees.

The version of the policy maintained on ASU's public website was substantially revised on August 28, 2024, several months after the events at issue in this lawsuit.[1] Moreover, Facilities Management Manual 115 appears to no longer technically exist, as the publicly available table of contents to that manual states that provision 115 has been moved to the Capital Programs Management Policies and Procedures Manual.[2] The version of the anti-camping policy that the University Defendants attach to their motion seems to be an archived version, but it is not clear whether ASU makes outdated versions of its policies available to the public. (*See* Doc. 90 Ex. 4.) Even if such access does exist, it is not clear to the Court how a member of the public would go about availing herself thereof. The University Defendants do not address any of these concerns, instead merely citing to *Skilstaf* for the highly generalized proposition that the Court may take judicial notice of public records. (University MTD at 2 n.2; University Reply at 14.) As it is unclear whether the anti-camping policy submitted by the University Defendants is a public record, the Court cannot judicially notice the policy. *See Newman v. San Joaquin Delta Cmty. Coll. Dist.*, 272 F.R.D. 505, 516 (E.D. Cal. 2011) (noting that the party requesting judicial notice bears the burden of persuading the court that the fact at issue is susceptible of judicial notice).

. . .

---

[1] *See* https://public.powerdms.com/ASU/documents/1557505.
[2] *See* https://provost.asu.edu/sites/g/files/litvpz671/files/page/2537/fac-facilities_management_manual-2017.pdf.

Although the Court will not consider the specific content of ASU's anti-camping policy, the Court will not blind itself to the fact that ASU has proffered some form of an anti-camping rationale as the explanation for the disciplinary actions at issue in this case. The SAC itself so alleges. (*See* SAC ¶ 79 (describing ASU's "curfew" as a post-hoc pretext); SAC ¶ 83 (averring that Defendant Michael Crow falsely stated that Plaintiffs had "erected fortifications" and falsely downplayed ASU police action "as simply helping ASU take down encampment tents").) The Court gleans from the face of the SAC that there exists one or more ASU policies prohibiting late-night occupation and encampments. However, the Court cannot at this juncture say what those policies consist of, whether Plaintiffs' conduct placed them within the ambit of such policies, or whether the administration of those policies was pretextual. Each of those issues remains a question of fact not amenable to resolution at this stage of litigation. Accordingly, the Court rejects the University Defendants argument that the anti-camping policy immunizes them from liability as a reasonable restriction on the time, place, and manner of expressive conduct that was enforced in a neutral manner. (*See* University MTD at 9–18.) Thus, the Court cannot credit the University Defendants' contentions that (1) Plaintiffs were not engaging in protected speech and (2) that viewpoint discrimination played no role in the suppression of Plaintiffs' speech. The content of the SAC belies those propositions, and the anti-camping policy is unavailable at this procedural juncture to salvage them.

**B.    Sufficiency of the Pleadings**

The primary thrust of the University Defendants motion to dismiss, and the sole thrust of Mr. Sheridan's motion to dismiss, is that the SAC lacks allegations of individualized wrongdoing by any defendant except ABOR. The University Defendants cite copious caselaw establishing that "group pleading" is insufficient to state a claim against individual defendants. (University MTD at 5–6.) Rather, when suing a collection of individuals for personal wrongdoing, the plaintiff must "show that each defendant personally played a role in violating the Constitution." *Hines v. Youseff*, 914 F.3d 1218, 1228 (9th Cir. 2019). In other words, "a plaintiff must plead that each Government-official

defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

Here, the allegations against the majority of the individual defendants are entirely inadequate. First, with respect to twenty-one of the thirty individual university defendants, the SAC contains literally no allegations of any kind (except assertions of their names and job titles in the "parties" section of the pleading). Of the nine individual university defendants that are at least mentioned in the body of the SAC, none save one are the subject of allegations that are sufficient to state a claim of individualized wrongdoing.

Regarding Joanne Vogel, the sole allegation is that she spoke with non-party Jonathan Greenblatt, who urged ASU to clamp down on anti-Zionist sentiment. (SAC ¶ 47.) Regarding Michael Thompson, the sole allegation is that he engaged in an unspecified communication with a fellow ASU executive. (SAC ¶ 53.) Those allegations of individualized wrongdoing are plainly insufficient.

Regarding ASU police officers Singh, Padilla, Latella, Van Buhler, Mason, and Bathke, the sole allegation is that they arrested Mr. Smith and/or Mr. Clancy without probable cause. (SAC ¶¶ 67, 69.) Although the Court appreciates Plaintiffs' argument that the two morning arrests undercut the argument that the remainder of the arrests were motivated solely by the evening anti-camping policy, and although the Court finds the morning arrests probative on that issue, the bare allegation of an unwarranted arrest does not demonstrate that the arresting officers were themselves motivated by pro-Zionist sentiments or were in any meaningful sense retaliating against Plaintiffs for their use of speech. The SAC does not allege that those officers were involved in the evening arrests, that they were present at any other instance where they could have or did enforce the anti-camping policy in a non-neutral manner, or that there exists any other fact indicating that any of these officers bore a personal animus towards Plaintiffs' speech. Absent some additional individualized allegations of anti-speech wrongdoing, Plaintiffs have failed to state a claim against the officers, even if their conduct remains relevant to Plaintiffs' claim against ASU. After all, Plaintiffs have not sued the officers merely for executing an illegal

arrest. Instead, Plaintiffs have brought suit against the officers alleging anti-speech retaliatory conduct. As Plaintiffs concede, their claims require not just that speech-chilling activity occurred, but also that the chilling of speech was a substantial or motivating factor in the defendants' conduct. (*See* University Response at 8.) Without at least one allegation demonstrating that the officers acted with an anti-speech purpose, Plaintiffs' claims against them fail. The only language in the SAC tying the officers to a violation of Plaintiffs' speech rights is the allegation that the aforementioned officers arrested Smith and Clancy "to send a message to other protestors that they too would be arrested if they remained at the protest." (*See* SAC ¶ 67.) That assertion, devoid of any supporting detail or explanation, is too conclusory to by itself support a claim. Plaintiffs would have the Court hold the above-named officers personally liable for First Amendment retaliation based not upon their own alleged conduct, but instead based upon the conduct of persons as far removed from the officers as the CEO of the Anti-Defamation League. Under the relevant pleading standard, the Court cannot do so.

Plaintiffs counterargue that they in fact do *not* need to plead their claims with individualized specificity. (University Response at 15.) Plaintiffs cite *Preschooler II v. Clark Cnty. Sch. Bd. of Trs.*, 479 F.3d 1175, 1182 (9th Cir. 2007), for the proposition that a civil-rights plaintiff need only "state the allegations generally." This citation is unavailing for two reasons. First, as the University Defendants note, *Preschooler II* predates *Iqbal* and *Twombly* and is therefore of questionable utility as a general statement of the applicable pleading standard. (University Reply at 2.) Second, and more importantly, *Preschooler II* is simply inapt. In *Preschooler II*, the allegedly wrongful conduct was inaction, whereas here the allegedly wrongful conduct is action (combined with a wrongful motive). *See* 479 F.3d at 1182. Allegations of wrongful inaction are naturally going to be less particularized than allegations of wrongful action. Additionally, *Preschooler II* examined allegations of supervisory liability, not direct liability. *Id.* The pleading standard that governs supervisory liability is not transferrable to the instant context.

. . .

> In a § 1983 suit or a *Bivens* action—where masters do not answer for the torts of their servants—the term "supervisory liability" is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct. In the context of determining whether there is a violation of a clearly established right to overcome qualified immunity, purpose rather than knowledge is required to impose *Bivens* liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities.

*Iqbal*, 556 U.S. at 677. The Court perceives no reason why that standard does not apply equally to Plaintiffs' state-law claim, as Plaintiffs do not contend that any defendant is liable as a result of supervisory or indirect liability thereon. Plaintiffs' accusations of anti-speech conduct and intent directed at the aforementioned individual defendants rest entirely upon the words and actions of other parties and nonparties. In defending their pleading, Plaintiffs point almost exclusively to allegations that "Defendants" writ large did various bad things. (University Response at 15–16.) That strategy is unavailing. "A plaintiff may not collectively accuse multiple defendants of committing misdeeds through the expedience of the title 'Defendants.'" *Jones v. Bank of Am. NA*, No. CV-17-08231-PCT-JJT, 2017 WL 11686858, at *2 (D. Ariz. Dec. 8, 2017). Accordingly, the claims against the aforementioned individual defendants fail.

The same is not true of Plaintiffs' claims against Michael Crow, the President of ASU. Mr. Crow is the sole individual defendant against whom Plaintiffs level specific allegations of anti-speech wrongdoing. As with Ms. Vogel, the SAC alleges that Mr. Crow spoke with Mr. Greenblatt prior to the protest and that Mr. Greenblatt urged Mr. Crow to come down hard on any anti-Zionist protests that might take place at ASU. However, unlike with Ms. Vogel, for whom there were no additional allegations, the SAC alleges that, after the protest and subsequent disciplinary actions, Mr. Crow lied about the extent to which Plaintiffs were preparing to occupy the Old Main in violation of the anti-camping policy. (*See* SAC ¶ 83.) Plaintiffs describe Mr. Crow's actions as an "embark[ation] upon a media campaign designed to spread misinformation about the actions of Defendants and

Plaintiffs on the night of April 26, 2024." That allegation is specific and non-conclusory, and it ties Mr. Crow to much of the other generalized ASU wrongdoing alleged in the SAC that remains inadequately related to any of the other individual defendants in this lawsuit. Insofar as Plaintiffs allege that ASU, as an entity, targeted them for their anti-Israel speech, the well-pled allegation that Mr. Crow furthered that targeting by lying about such targeting after the fact, combined with the allegation that Mr. Crow was encouraged to engage in such targeting prior to the fact, renders plausible the inference that Mr. Crow personally engaged in illegal First Amendment retaliation.[3] To be sure, the allegations against Mr. Crow are tenuous and rather threadbare, but the Court concludes that they are sufficient to satisfy the federal judiciary's relatively lenient standard of notice pleading.

Thus, with respect to the University Defendants, the Court concludes that the claims thereagainst fail as a matter of law except as to ABOR and Mr. Crow. The Court further concludes that the claim against Mr. Sheridan also fails as a matter of law. As Mr. Sheridan correctly notes, the SAC contains no allegations that connect Mr. Sheridan to the anti-speech retaliatory scheme allegedly perpetuated by ASU. The only well-pled allegations in the SAC relating to Mr. Sheridan are the allegations that (1) ASU preemptively requested assistance from the Maricopa County Sheriff's Office with the transportation of arrestees, (SAC ¶ 54), and (2) that the Sheriff's Office did in fact assist with the processing and transportation of arrestees, (SAC ¶ 63). Those allegations are insufficient to show that Mr. Sheridan (or his predecessor or any other decisionmaker in the Sheriff's Office) in any manner sympathized with or even knew about the alleged retaliation motivating ASU's actions. Although Plaintiffs adduce caselaw indicating that a single action can reveal the requisite "policy or custom" of indifference to a victim's

---

[3] To the extent that the University Defendants suggest that the SAC does not adequately allege that ASU, as an entity, retaliated against Plaintiffs for their use of speech, (*see* University MTD at 23–24), the Court disagrees. First, for the reasons already given, the Court cannot determine at this juncture whether Plaintiffs violated an anti-camping policy. Second, the Court rejects the University Defendants' argument that "[t]he SAC also alleges no facts plausibly showing that any University Defendant took any action in a content- or viewpoint-based way." (University MTD at 23–24.) Under any fair reading of the SAC, Plaintiffs have plainly alleged a non-neutral application of ASU's time-place-and-manner regulations.

constitutional rights that is necessary to state an official-capacity claim against a sheriff's office, (*see* University Response at 4), the single action that Plaintiffs identify in this lawsuit does not come close to doing so. Without some allegation indicating that the Sheriff's Office acted with a wrongful intent or at the very least acted with indifference as to the wrongful intent of ASU, no claim for anti-speech retaliation against Mr. Sheridan can lie. The only allegation in the SAC that attempts to link Mr. Sheridan to a First Amendment violation is the conclusory assertion that "ASU PD, Maricopa County, and Arizona Department of Public Safety officers worked together to systematically break up the peaceful protest, arresting anyone who refused to capitulate to the obvious violation of their free speech rights." (SAC ¶ 64.) Although, as already stated, the Court cannot blindly credit the University Defendants' contention that the various law enforcement actions in this case were entirely motivated by a neutral anti-camping policy, neither can the Court blindly credit Plaintiffs' unadorned contention that the actions of the Sheriff's Office were "obvious[ly]" in contravention of Plaintiffs' First Amendment rights.

In sum, the Court will dismiss all claims except those against Mr. Crow and ABOR. The Court's analysis of the SAC's *prima facie* validity is concluded. The Court now turns to the raft of affirmative defenses advanced by the University Defendants.

### C.    Affirmative Defenses

Some of the affirmative defenses asserted by the University Defendants depend upon fact-finding related to ASU's anti-camping policy and Plaintiffs' alleged violation thereof. For the reasons given above, those defenses are not yet ripe for adjudication. For instance, the University Defendants assert that Mr. Crow enjoys qualified immunity regarding his alleged targeting of Plaintiffs based upon the content of their protest. (University MTD at 20–22.) This argument, insofar as it has merit, appears to depend upon the proposition that Plaintiffs were protesting in violation of ASU's anti-camping policy. (*See* University MTD at 21–22 ("No precedent holds that police officers cannot arrest and university employees cannot suspend university students who participate in protests on campus involving 'encampment tents' in violation of valid restrictions on expressive

conduct and refuse to 'voluntarily leave.'").) Resolution of that defense must await a later day. In addition to the anti-camping policy, the University Defendants also submit several other bases of affirmative defense.

### 1.    Collateral Estoppel / Issue Preclusion

The University Defendants argue that Plaintiffs are collaterally estopped from challenging their suspensions because they failed to seek judicial review thereof. (University MTD at 18.) This argument is complicated and somewhat unclear in its particulars. As noted, the protest at issue occurred on April 26, 2024. Plaintiffs received notices between April 26 and April 28 that ASU was placing them on interim suspension. (*See* Doc. 90 Exs. 5–20.) Plaintiffs filed suit on April 30. (*See* Doc. 1.) Months later, Plaintiffs received notices of final disciplinary action. (*See* Doc. 90 Exs. 24–40.) Each of these notices included a finding that Plaintiffs had violated the anti-camping policy. Both the interim notices and the final notices contained procedures for appeal. Plaintiffs allege that they appealed the disciplinary measures imposed against them, but Plaintiffs do not clarify whether they appealed the interim discipline, the final discipline, or both. (*See* SAC ¶¶ 84, 89.) The University Defendants contend that Plaintiffs did not appeal any final disciplinary decision, thereby implying that Plaintiffs' allegations of appeal must of necessity be limited to the interim decisions. (*See* University MTD at 18.) According to the University Defendants, "Plaintiffs' failure to seek judicial review of the decisions to suspend them from ASU bars the SAC's challenge to those suspensions," and "Plaintiffs thus cannot collaterally attack these suspension decisions." (University MTD at 18.) Plaintiffs do not contest the University Defendants' assertion that they failed to appeal the final disciplinary actions. (*See* University Response at 16–17.)

Plaintiffs interpreted the University Defendants' argument as one predicated on the doctrine of administrative exhaustion and responded accordingly. (University Response at 16–17.) However, the University Defendants clarify in their Reply that they are not presenting any argument premised on administrative exhaustion and are actually advancing a defense based upon "res judicata." (University Reply at 6.) Res judicata generally refers

to claim preclusion. However, the Arizona judiciary has noted that the term "res judicata" is confusing, as it has historically been used to refer to both claim preclusion and issue preclusion. *Circle K Corp. v. Indus. Comm'n of Arizona*, 179 Ariz. 422, 425–26 (Ct. App. 1993). The Court interprets the University Defendants' argument as invoking issue preclusion, rather than claim preclusion, as neither party contends that Plaintiffs previously sued the University Defendants upon either of the claims brought in this lawsuit. Thus, the Court understands the University Defendants to argue that, irrespective of whether Plaintiffs did or did not in fact violate the anti-camping policy, and irrespective of whether the Court can or cannot judicially notice said policy, the doctrine of issue preclusion demands that the Court honor ASU's administrative finding that Plaintiffs violated the anti-camping policy.

In Arizona, the general rule is that "collateral estoppel [i.e., issue preclusion] may apply to decisions of administrative agencies acting in a quasi-judicial capacity." *Hawkins v. State*, 183 Ariz. 100, 103 (Ct. App. 1995). "For a party to successfully assert issue preclusion as an affirmative defense, it must show that (1) the issue at stake is the same in both proceedings; (2) the issue was actually litigated and determined in a valid and final judgment issued by a tribunal with competent jurisdiction; (3) the opposing party had a full and fair opportunity to litigate the issue and actually did so; and (4) the issue was essential to the judgment." *Legacy Found. Action Fund v. Citizens Clean Elections Comm'n*, 254 Ariz. 485, 492 ¶ 24 (2023) (internal citation omitted). Although the University Defendants are correct that a party's refusal to participate in an appeal can carry issue preclusive effect, *see Torres v. Zurich Am. Ins. Co.*, No. CV-23-02535-PHX-JJT, 2024 WL 4817941, at *3–4 (D. Ariz. Sept. 16, 2024), it is unclear whether the appeals that Plaintiffs refused to participate in constituted a full and fair opportunity to litigate the issue of whether they violated the anti-camping policy.

The Arizona Supreme Court has held that issue preclusion does not attach to an agency decision that resulted from a non-neutral adjudication of the issue in question. *See Legacy Found. Action Fund v. Citizens Clean Elections Comm'n*, 254 Ariz. 485, 493 ¶ 28

(2023). Although the facts of this case differ markedly from those of *Legacy* and the cases cited therein, it nevertheless cannot be ignored that Plaintiffs in the instant matter allege that the appeal afforded to them was essentially a sham. Not only do Plaintiffs expressly castigate the investigations preceding the final disciplinary measures as a "sham," (*see* SAC ¶ 85), but Plaintiffs also assert that the "arbiters" of the disciplinary appeals were themselves "hostile," (*see* SAC ¶ 89). If, as Plaintiffs allege, the appellate process made available to them was neither full nor fair, then such illegitimacy would likely preclude application of issue preclusion, notwithstanding the possibility of a subsequent appeal to superior court. As the Arizona Supreme Court recognized in *Legacy*, "the availability of an appeal to the superior court did not cure the due process violation because the court would have deferentially reviewed the Commission's non-neutral findings of fact." 254 Ariz. at 494 ¶ 36. Of course, the Court does not conclude that ASU's appellate procedures were insincere merely because Plaintiffs have alleged them to be so. But the Court cannot discredit Plaintiffs' allegations, particularly as the University Defendants do not meaningfully respond thereto. Indeed, this entire issue of issue preclusion remains essentially unbriefed. As noted, Plaintiffs responded to a misapprehended argument of administrative exhaustion, and, although the University Defendants clarified in their Reply that their argument actually rests upon "res judicata," they did not materially grapple with the elements thereof.

Further complicating matters is the fact that the agency determination on the issue of Plaintiffs' alleged camping violation occurred *after* Plaintiffs had already filed suit. Although the agency findings predate the SAC, they postdate the original complaint by several months. The University Defendants do not address this wrinkle, and it is unclear whether the doctrine of issue preclusion would apply in this seemingly unique temporal circumstance. For all these reasons, the Court rejects the University Defendants' preclusion argument. Such rejection is without prejudice, as neither party robustly briefed the issue. The University Defendants may timely reassert this affirmative defense in a subsequent filing.

### 2. Sovereign Immunity

The University Defendants argue that ABOR (and, by association, Mr. Crow in his official capacity) is entitled to sovereign immunity on Plaintiffs' state-law claim. (University MTD at 22.) This argument poses a difficult question of law.

It is uncontested that ABOR is an arm of the state of Arizona and is therefore entitled to sovereign immunity. Such sovereign immunity generally applies not only to federal claims, but also to supplemental state-law claims brought in a federal forum, such as the claim in the instant lawsuit arising under A.R.S. § 15-1864. *See Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 540–41 (2002). Thus, ABOR is immune from the instant lawsuit unless Plaintiffs can demonstrate (1) that Congress abrogated ABOR's sovereign immunity or (2) that Arizona has voluntarily waived its sovereign immunity. *See Stanley v. Trs. of Cal. State Univ.*, 433 F.3d 1129, 1133 (9th Cir. 2006). Congressional abrogation is not at issue, as the parties' sovereign-immunity dispute relates to the SAC's state-law claim. (*See* University MTD at 22; University Response at 19; University Reply at 11.) Plaintiffs contend that the Arizona legislature statutorily waived ABOR's sovereign immunity regarding the state-law claim. (University Response at 19–21.)

In 1984, the Arizona legislature waived its sovereign immunity regarding claims arising under "the statutes and common law of this state." *Warrington by Warrington v. Tempe Elementary Sch. Dist. No. 3*, 187 Ariz. 249, 252 (Ct. App. 1996). Based on that act of the Arizona legislature, the Arizona judiciary has stated repeatedly that governmental amenability to suit is the rule, and immunity the exception. *See id.*; *Redgrave v. Ducey*, 251 Ariz. 451, 458 ¶ 27 (2021) ("Where a claim is based upon 'the statutes and common law of this state,' the Act's command is clear: absent some other form of immunity[,] the state is presumptively amenable to suit.") The University Defendants contend that the legislative act quoted above applies only to cases in state court and does not extend to cases in federal court. (University Reply at 11–12.) The Court disagrees.

The United States Supreme Court has held that a state's waiver of its sovereign immunity must be "unequivocally expressed." *Pennhurst State Sch. & Hosp. v.*

*Halderman*, 465 U.S. 89, 99 (1984). "Thus, a State does not consent to suit in federal court merely by consenting to suit in the courts of its own creation." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999). "Nor does it consent to suit in federal court merely by stating its intention to 'sue and be sued,' or even by authorizing suits against it 'in any court of competent jurisdiction.'" *Id.* (citations omitted). The Arizona legislature "recognize[d] the inherently unfair and inequitable results which occur in the strict application of the traditional doctrine of sovereign immunity" and thus "declared [it] to be the public policy of this state that public entities are liable for acts and omissions of employees in accordance with the statutes and common law of this state." *Warrington*, 187 Ariz. at 252. The legislature then directed that "[a]ll of the provisions of this act should be construed with a view to carry out the above legislative purpose." *Id.* That legislative declaration, which lacks express reference to a federal forum, would appear not to satisfy the United States Supreme Court's stringent requirement regarding waiver. However, the Arizona Supreme Court's 2021 *Redgrave* opinion satisfies this Court that Arizona has indeed unequivocally waived its sovereign immunity over claims arising out of the statutes and common law of this state, even where, as here, such claims are brought in federal court.

In *Redgrave*, the Arizona Supreme Court confronted a situation that is the precise inverse of the instant matter. There, a Plaintiff sought to sue the state of Arizona on a federal-law FLSA claim in state court. *Redgrave*, 251 Ariz. at 452–53 ¶¶ 3–4. Arizona asserted that it enjoyed sovereign immunity from FLSA liability, irrespective of the fact that the plaintiff chose to bring her federal claim in a state forum. *Id.* The Arizona Supreme Court was thus called upon to determine what analytical standard governs the determination of whether the state of Arizona has waived its sovereign immunity on a federal claim asserted in a state forum. *Id.* at 453–54 ¶¶ 9–10. The state advocated for application of the United States Supreme Court's "stringent" test, whereas the plaintiff pressed the Court to embrace the "less exacting approach" that Arizona courts utilize when determining whether the state waived its sovereign immunity regarding state-law claims.

*Id.* The Court sided with the state, holding that the paramount factor in the Arizona sovereign-immunity calculus is the source of the substantive claim, not the fortuity of what forum happens to be adjudicating that claim. *Id.*

In so holding, the Arizona Supreme Court specifically rejected the "venue-based conception of the appropriate waiver standard" that the plaintiff proposed in *Redgrave*, that the University Defendants press for here, and that the Oregon Court of Appeals adopted in *Byrd v. Or. State Police*, 238 P.3d 404 (2010). In *Byrd*, the Oregon court held that the state of Oregon could not assert sovereign immunity regarding an FLSA claim brought in state court, even if the state could assert sovereign immunity over an identical claim brought in federal court. *Id.* at 405–06. The Arizona Supreme Court held that the Oregon court's approach improperly elevated the importance of coincidences of venue over legal substance. The Arizona court noted with disapproval the fact that a "venue-based" approach would result in an absence of "reciprocal privilege," meaning that the state of Arizona would be entitled to sovereign immunity in one forum but not in another even where the claims in each forum are the same. *Redgrave*, 251 Ariz. at 455–56 ¶ 18.

The Arizona Supreme Court's holding in *Redgrave* is of course not directly controlling here, as the determination of whether the Arizona legislature waived the state's sovereign immunity over claims that it created but that are brought in a federal court raises concerns that are similar but not identical to the determination of whether the Arizona legislature waived the state's sovereign immunity over claims created by Congress that are brought in a state court. Nevertheless, this Court finds the Arizona Supreme Court's reasoning both compelling and applicable to the instant matter. As the court noted, "whether waiver has in fact occurred is undeniably a state law question, [and] [s]tate courts remain the ultimate interpreters of the laws by which such waivers are generally made." *Id.* Thus, although the Arizona legislature's waiver of its sovereign immunity as to all claims based on "the statutes and common law of this state" may not have been sufficiently unequivocal to by itself satisfy the federal judiciary's stringent waiver standard, the Court is satisfied that the statutory waiver in combination with the Arizona Supreme Court's

interpretive gloss is adequate to effectuate a waiver. The legislature's waiver of sovereign immunity regarding state-law claims, read alongside the state supreme court's subsequent holding that the source of the substantive law is indeed paramount and not merely the product of imprecise legislative drafting, is an unequivocal waiver. The Arizona Supreme Court's rejection of a venue-based approach and emphasis on immunity reciprocity only strengthen the conclusion. Moreover, the court specifically noted that a statute providing that "every public body is subject to action or suit for its torts," combined with a judicial opinion holding that a particular cause of action is a tort, constitutes "an express and unequivocal waiver of immunity for torts." *Id.* at 456 ¶ 19. This guidance from the ultimate authority on Arizona law informs the Court's analysis here.

The University Defendants offer no counterargument. Although they cite a case for the proposition that A.R.S. § 15-1864 did not waive sovereign immunity, that argument is immaterial, as that statute is not the statute that Plaintiffs proffer as a waiver, nor is it the statute analyzed in *Redgrave*. The University Defendants' sole contention that is responsive to Plaintiffs' position is that "the response cites no case from any court in this country at any time over the last six decades adopting this novel interpretation." (University Reply at 10.) That assertion fails to persuade, as a waiver is a waiver even if no court has previously recognized it as such. The assertion is also particularly unconvincing here, as the *Redgrave* opinion is only four years old. The University Defendants' failure to grapple with Arizona sovereign-immunity law forecloses further analysis on this point.[4]

## IV. Conclusion

All claims in this lawsuit are dismissed except for those against ABOR and Michael Crow. Such dismissals are not subject to leave to amend. Plaintiffs do not expressly request an opportunity to amend, but they include caselaw in their rule statement indicating that amendment should be liberally permitted. (*See* University Response at 5.) Although it is

---

[4] The question of sovereign immunity addressed herein may have been a good candidate for certification to the Arizona Supreme Court. *See* Ariz. R. Sup. Ct. 27. However, neither party broached the possibility of certification. Moreover, "[m]ere difficulty in ascertaining local law is no excuse for remitting the parties to a state tribunal for the start of another lawsuit." *Riordan v. State Farm Mut. Auto. Ins. Co.*, 589 F.3d 999, 1009 (9th Cir. 2009) (quoting *Lehman Bros. v. Schein*, 416 U.S. 386, 390 (1974)).

true that the federal judiciary generally grants leave to amend on a liberal basis, *see Foman v. Davis*, 371 U.S. 178, 182 (1962), the policy in favor of allowing amendments is subject to limitations. After a defendant files a responsive pleading or a motion under Rule 12(b), (e), or (f), the propriety of leave to amend is determined by consideration of five factors: "bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously amended the complaint." *See United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011). "[W]hen a district court has already granted a plaintiff leave to amend, its discretion in deciding subsequent motions to amend is 'particularly broad.'" *Chodos v. W. Publ'g Co.*, 292 F.3d 992, 1003 (9th Cir. 2002) (quoting *Griggs v. Pace Am. Grp., Inc.*, 170 F.3d 877, 879 (9th Cir. 1999)).

Here, Plaintiffs have already amended their pleading twice. Crucially, the second amendment came on the heels of a motion arguing for dismissal on the grounds that the First Amended Complaint lacked individualized allegations of wrongdoing. (*See* Doc. 32, FAC at 6.) Several weeks after that motion was filed, the Court granted Plaintiffs leave to conduct limited early discovery for the purpose of ascertaining which ASU employees were appropriate defendants in this matter. (*See* Doc. 31; Doc. 44.) Only upon completing limited early discovery did Plaintiffs file the SAC. Thus, after conducting several months of discovery with the express aim of remedying a defect in the FAC, Plaintiffs filed an amended pleading marred by the same defect. The Court concludes that further amendment would be futile. Accordingly, leave to amend is denied.

**IT IS THEREFORE ORDERED** granting in full Mr. Sheridan's Motion to Dismiss (Doc. 88).

**IT IS FURTHER ORDERED** granting in part and denying in part, as described hereinabove, the University Defendants' Motion to Dismiss (Doc. 89).

Dated this 28th day of July, 2025.

_____
Honorable John J. Tuchi
United States District Judge